Filed 6/21/16  P. v. Fleming CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>DANIEL AMES FLEMING,<br><br>     Defendant and Appellant. | F069897<br><br>(Tuolumne Super. Ct.<br>No. CRF42059)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Thomas P. Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Daniel Ames Fleming agreed to drive his friend Charles Verville (Verville) to the store. After they got into his Jeep, defendant told Verville that he was going to take him "four-wheeling" on an old mine road that was unpaved, rutted, and steep. As defendant performed a U-turn over brush, he hit some type of obstruction and Verville slammed his head into the Jeep's roll bar. Verville suffered a large gash on his forehead, which required 26 stitches. The responding officers determined both men had been drinking. Defendant claimed Verville had been driving. Defendant's blood-alcohol content was 0.19 percent.

After a jury trial, defendant was convicted as charged of count I, driving under the influence causing injury (Veh. Code, § 23153, subd. (a));[1] and count II, driving under the influence with a blood-alcohol content over 0.08 percent causing injury (§ 23153, subd. (b)), with an enhancement for the personal infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)). Defendant admitted he had a prior conviction for driving under the influence in 2011 (§§ 23152, subd. (a), § 23566, subds. (a), (b), (c)). He was placed on probation for five years subject to certain terms and conditions.

On appeal, defendant argues both his convictions must be reversed for insufficient evidence that he committed an unlawful act or neglected a legal duty apart from driving while intoxicated. He also contends the prosecutor committed prejudicial misconduct in closing argument and misstated the applicable legal principles. We affirm.

## FACTS

Niccoli Sandelin (Sandelin) lived on Canyon View Drive in Ponderosa Hills, located in Tuolumne County. His house was adjacent to Old Buchanan Mine Road. Sandelin testified the mine road was a gravel, rutted road that was unpaved and bumpy, and people frequently went "four-wheeling" on it.

---

[1] All further statutory citations are to the Vehicle Code unless otherwise indicated.

2.

Around 2:00 p.m. on August 16, 2013, Sandelin was inside his house and heard a "loud banging noise" outside, "like a vehicle of some sort, almost a wrecking noise." It was a "crashing noise," like a "thumping." Sandelin testified:

> "[W]e have a lot of people drive up and down that road all the time and there [are] big boulders, so it sounded almost as if it had dropped off of like – like the vehicle's tire had dropped off of a big boulder."

Sandelin looked out the window and saw a red Jeep on the dirt road, about 50 yards away. There were "a bunch of big rocks" in the area of the Jeep.

A man was sitting in the passenger seat. He was leaning back and holding his forehead. This man was later identified as Charles Verville.

Sandelin testified another man was standing outside the Jeep, on the driver's side of the vehicle. Sandelin later identified defendant as this man. The Jeep's hood was raised, and defendant was looking into the engine compartment as if he was trying to fix something. Sandelin testified defendant appeared frustrated and upset. "He was moving from the driver's portion in front to the passenger's side and then back around to the driver's side of the vehicle, and then back to the hood, and he had done that a couple of times." Sandelin did not see defendant pull a bottle from the Jeep and drink from it.[2]

Sandelin testified Verville got out of the Jeep, and both men started hiking up the dirt road together. Sandelin never saw Verville walk by himself or leave defendant with the Jeep. Verville did not need help to get out of the Jeep, but defendant appeared to assist Verville as they walked up the hill.

As the two men walked up the steep road, Verville tripped and fell down. Defendant initially tended to Verville. Defendant then ran "down the hill" and back to the Jeep. Defendant was yelling for help and for someone to call 911.

---

[2] As we will explain below, Verville testified at trial and claimed that defendant drank alcohol after he was injured. Verville failed to mention this claim to any of the investigating officers.

3.

Sandelin called 911. He got a glass of water and "ran it down" to Verville. Verville had a big laceration above his right eyebrow and it was bleeding. Sandelin testified Verville "seemed out of it," and he was slurring his words. Verville was not able to get up, he was unstable, and he had no balance.

Sandelin advised defendant that he had called 911. Defendant walked back to where Verville was sitting on the road.

**The initial investigation**

At 2:11 p.m., Tuolumne County Sheriff's Corporal Robert Nikiforuk responded to the 911 dispatch. He drove into the Ponderosa Hills subdivision to reach Sandelin's house. Catherine Faught was driving in the opposite direction. She had also called 911, and reported a man had knocked on her car and asked for help for his friend. Faught said she saw another man sitting in the passenger side of a red Jeep, and the man was bleeding from his head.

Corporal Nikiforuk continued to Canyon View Drive and contacted Sandelin, who led him to the two men. Defendant and Verville were sitting in the shade on the side of the dirt road, about 30 to 50 yards away from the Jeep. Verville had a laceration above his right eyebrow that was about one and one-half inches long. It was bleeding "pretty good."

Corporal Nikiforuk testified he spoke to both defendant and Verville. He could "smell the strong odor of alcohol beverages emitting from both persons. Both of them seemed to be moving a little slow," and their speech was slurred.

Corporal Nikiforuk asked Verville what happened. Verville said they were "four-wheeling in the Jeep and they hit a bump and he hit his head on the roll bar." Verville never said that the front seat latch broke or that the seat moved.

Corporal Nikiforuk also spoke to defendant and testified defendant was "pretty calm the whole time." Defendant said they were "four-wheeling," they hit a bump, and

4.

Verville split his head. Defendant said that "he drank between ten and twelve beers that day."

Corporal Nikiforuk testified that defendant never said he had just grabbed a bottle of alcohol from the Jeep and drank it. He would have written down such a statement about postaccident drinking because it would have been important, and it might have meant that the person was not intoxicated at the time of actual crash.

Corporal Nikiforuk looked at the Jeep and saw blood on the top of the roll bar, directly above the passenger side of the windshield.

Corporal Nikiforuk called emergency personnel to treat Verville. An ambulance arrived and transported Verville to Sonora Regional Medical Center. Verville received 26 stitches on his forehead laceration.

Corporal Nikiforuk advised defendant that he was going to call an officer from the California Highway Patrol (CHP) to continue the investigation. Defendant did not make any further statements.

**Officer Pulido's investigation of defendant**

At 2:49 p.m., CHP Officer Faustino Pulido arrived at Sandelin's house. Sandelin directed him to the location where Corporal Nikiforuk was waiting with defendant by the Jeep. Pulido spoke to Sandelin and Nikiforuk about what happened. He walked over to the Jeep and saw blood on the roll bar above the passenger seat. Verville had already been transported to the hospital.

Officer Pulido testified defendant was sitting on the side of the road. When he spoke to defendant, he immediately noticed defendant had red, watery eyes and his speech was slurred. Defendant said they were "four-wheeling." Defendant also said he was the passenger and Verville was driving the Jeep. Defendant said Verville drove over a bump and hit his head.

Officer Pulido asked defendant why there was blood on the passenger side of the Jeep if Verville was driving. He also asked defendant to walk over to the Jeep and look

5.

at it.  Defendant got up and walked to the Jeep, and he had an unsteady gait and poor balance.

After defendant looked at the Jeep, Officer Pulido asked defendant "if he would like to tell me the truth."  Pulido advised defendant that a lady called in and reported that the passenger's head was bleeding.  Defendant again said Verville was driving when they hit the bump.  Defendant added that after Verville suffered the head injury, they switched seats and defendant got in the driver's seat because he was trying to get help for Verville.  Defendant said he only drove the car from the top of the hill after Verville was hurt.  Defendant said he was telling the truth, and Verville would corroborate his story if they asked him.  Defendant never said he drove his Jeep from his home to the dirt road.

Officer Pulido advised defendant that he was going to conduct field sobriety tests (FSTs).  Defendant said he had severe arthritis in his legs.  Pulido modified the tests to account for his physical limitations.

Pulido asked defendant whether he had been drinking.  Defendant said he drank "a three pack of 24-ounce beers" at his home, and he had stopped a couple of hours earlier.  Pulido asked defendant if he felt the effects from the alcohol.  Defendant said he felt " '[i]mpairment of judgment and physical movement.' "

Officer Pulido testified defendant performed poorly in the FSTs.  Defendant's fists were clenched and rigid.  When was standing, he was "just swaying in all directions, forward, backwards and circular motion."

Officer Pulido concluded defendant had been driving under the influence of alcohol based on the following circumstances:

> "Objective signs and symptoms of alcohol symptoms:  Red, watery eyes; slurred speech; poor coordination; the strong odor of alcohol emitting from his breath and person; his admission to consuming alcohol; his admission of operating a motor vehicle; his performance on the field sobriety tests, which again were limited because of his impairment that he had claimed of severe arthritis.  But taking that as a whole, I determined

6.

that he was driving or operating a motor vehicle while under the influence of an alcohol beverage."

Officer Pulido arrested defendant and he consented to a blood test. Pulido placed defendant in the front passenger seat of his patrol car. Defendant began to have a panic attack and said he couldn't breathe. Pulido drove him to Sonora Regional Medical Center for treatment and the blood test.

Defendant's blood was drawn at 4:35 p.m. His blood-alcohol content was 0.19 percent.

**Officer Pulido's interview of Verville**

After defendant was treated at the hospital, Officer Pulido booked him at the county jail, and then returned to the hospital to speak with Verville. Verville was still being treated in the emergency room for his head laceration.

Officer Pulido told Verville that he talked to defendant, and defendant admitted driving after consuming alcohol. Pulido told Verville that he wanted to hear his statement and get the truth. Verville said he did not want to get anyone in trouble. Pulido replied that he just needed to say what happened.

Verville told Officer Pulido that defendant was driving. They went "four-wheeling," and defendant hit "some rough potholes." Pulido asked Verville how his head was injured. Verville said he was wearing his lap belt, but he bumped his head on the roll bar.

Verville "said they had each consumed two 24-ounce Bud Lights" at their respective homes before they got into the Jeep. Verville never said that defendant took a bottle from under the Jeep's seat and drank at the scene after the injury.

**Verville's trial testimony**

Verville testified as a prosecution witness and offered a different version of the incident from his prior statements. Verville lived in a cabin on Highway 108 in Tuolumne County. Defendant was his neighbor and recent friend.

7.

Verville testified he started drinking at his house on the morning of August 16, 2013. He drank three 24-ounce beers and three shots of whiskey. In the afternoon, defendant walked to Verville's house. Defendant was drinking a 16-ounce Clamato, a mixture of juice and beer when he walked into Verville's residence.

Verville testified he asked defendant to drive him to the store to buy more alcohol, and defendant agreed. Verville testified he was "buzzed" and did not want to drive himself. Verville did not smell any alcohol on defendant. Defendant walked back to his house, got into his red Jeep, and picked up Verville.

During the drive, defendant said he wanted "to take me four-wheel driving and so we decided to go to the store after we got done with the four-wheel driving."

Defendant's Jeep had a roll-bar around the entire frame, and the hard top had been removed. The Jeep had a one-piece front bench seat for the driver and passenger, which locked into place with a clip. Both men were wearing seatbelts.

Verville testified defendant turned on Confidence Road, which began as a paved road and then turned into Old Buchanan Mine Road. Verville testified it was an unpaved dirt road without any dividing lines. Defendant told Verville, " 'I want to take you, show you how good this drives off road.' " Verville agreed and said, " 'Yeah, let's check the old Jeep out.' "

Verville testified they were "off-roading" for about 20 to 30 minutes. As defendant drove on the unpaved and bumpy road, he made a U-turn in the brush, and hit a bump or a pothole that had not been visible. Verville testified: "[W]e went off road and he hit, like, a dip, you know, a bump."

Verville believed the impact released the clip that locked the one-piece front seat into place. The entire front seat moved forward, and Verville was tall enough that his forehead hit the front portion of the roll bar.

Verville testified he bumped his head, but he did not think it was a big deal. However, defendant looked at him and said he was injured. Verville then realized his head was bleeding.

Defendant panicked and "freaked out" about the blood on Verville's face. Defendant was shaking, crying, and upset. Verville testified that defendant had a tendency to suffer from anxiety and panic attacks, even when he was not drinking, and it was hard to calm him down. Verville told defendant to relax because he had been in "bigger fights," and the injury didn't bother him.

Verville testified defendant drove "down that hill" and tried to get back to the main road, and the Jeep stalled. Defendant restarted the Jeep, but it stalled again and "that's when [defendant] really freaked out."

Verville testified he got out of the Jeep. Verville decided to walk up the hill to get help because there was so much blood on his face, and he realized that he needed a doctor.

**Verville's testimony about defendant's consumption of alcohol**

At trial, Verville testified that defendant got out of the Jeep but stayed next to it as Verville walked away. Verville looked back and saw defendant drink something: "[A]fter the car died, [defendant] started screaming for someone to help, and I told him to calm down. And he went underneath the [Jeep's] seat and grabbed a bottle, downed it, tossed it into the bushes, kept on yelling."

Verville testified he was looking at defendant when he grabbed the bottle. Defendant took two "long gulps" from the bottle, "chugged" the contents within three seconds, and tossed it into the bushes. Verville testified he had walked about 20 to 50 yards away from the Jeep, and he was not close enough to see what defendant drank. Verville thought it was a "hard liquor bottle," but conceded it could have contained water. He thought the bottle was smaller than a fifth, and it could have been a pint or half-pint.

Verville testified that after defendant drank from the bottle, Verville again told him to calm down "because he was going to get himself in trouble after downing that bottle." Verville testified that he could not remember if defendant raised the Jeep's hood to look at the engine. Verville turned away from the Jeep and walked up the road. It was too steep for his physical condition and he slid down. A man came out of his house and said he had called 911, and then the police arrived.

Verville testified that he did not speak to an officer at the scene. He was taken to the hospital and talked to an officer while he was being treated. Verville did not know that defendant was arrested for driving under the influence.

Verville testified that when he was being treated at the hospital, an officer said defendant had already admitted that he was drinking. The officer asked Verville how much they drank. Verville testified he told the officer that defendant just drank Clamato. Verville testified that he did not tell the officer that defendant pulled a bottle from the Jeep and drank it after the collision. Verville did not disclose this information until he appeared at trial.

Verville acknowledged that it might have helped defendant's case if he told the police that defendant drank alcohol after the accident. However, Verville did not want to volunteer any information to the police because "I didn't think it was any of my business, and I really didn't want to be involved with any of this."

Verville admitted that when he spoke to the officer at the hospital, he did not say anything about the front seat's clip being released or the seat moving forward.

Verville denied Officer Pulido's account of their interview at the hospital. Verville did not know that defendant told Pulido that Verville had been driving.

### DISCUSSION

I. **Substantial Evidence for Counts I and II**

Defendant contends there is insufficient evidence to support his convictions in count I, driving under the influence causing injury (§ 23153, subd. (a)); and count II,

driving under the influence with a blood-alcohol content over 0.08 percent causing injury (§ 23153, subd. (b)).  He argues the prosecution failed to prove that he committed an unlawful act or neglected a legal duty, aside from driving under the influence, which is required to convict for both offenses.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331, fn. omitted.)  "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.  [Citation.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

### A.  Section 23153

Defendant was convicted in counts I and II of violating section 23153, subdivisions (a) and (b), respectively.  These provisions state in relevant part:

> "(a) It is unlawful for a person, while under the influence of any alcoholic beverage to drive a vehicle *and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle*, which act or neglect proximately causes bodily injury to any person other than the driver.

> "(b) It is unlawful for a person, while having 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle *and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle*, which act or neglect proximately causes bodily injury to any person other than the driver."  (Italics added.)

"[T]he elements of section 23153, subdivision (a), are as follows:  (1) driving a vehicle while under the influence of an alcoholic beverage or drug; (2) when so driving, committing some act which violates the law or is a failure to perform some duty required

11.

by law; and (3) as a proximate result of such violation of law or failure to perform a duty, another person was injured.  [Citation.]  Section 23153, subdivision (b), has the same elements except the first element is expressed as driving a vehicle 'while having 0.08 percent or more, by weight, of alcohol in his or her blood ....'  [Citation.]" (*People v. Minor* (1994) 28 Cal.App.4th 431, 437–438; *People v. Weems* (1997) 54 Cal.App.4th 854, 858; *People v. Givan* (2015) 233 Cal.App.4th 335, 349.)

The second element for both subdivisions "is separate from and is not satisfied by evidence the defendant was driving under the influence of alcohol or drugs while operating the vehicle.  [Citation.]" (*People v. Capetillo* (1990) 220 Cal.App.3d 211, 216.)  "To satisfy the second element, the evidence must show an unlawful act or neglect of duty *in addition* to driving under the influence.  [Citation.]" (*People v. Minor*, *supra*, 28 Cal.App.4th at pp. 437–438, italics in original; *People v. Weems*, *supra*, 54 Cal.App.4th at p. 858; *People v. Givan*, *supra*, 233 Cal.App.4th at p. 349.)

"It is a general intent crime to violate … section 23153, subdivisions (a) or (b).  [Citations.]" (*People v. Givan*, *supra*, 233 Cal.App.4th at p. 349.)  "[T]he unlawful omission element of section 23153 need not relate to any specific section of the Vehicle Code, but instead may be satisfied by the defendant's ordinary negligence.  [Citations.]" (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1185.)

"A variety of acts or omissions have been held to satisfy the unlawful act requirement of section 23153 …." (*People v. Weems*, *supra*, 54 Cal.App.4th at p. 861.)  "These acts include the failure to yield the right of way to a pedestrian, [citation]; violating the basic speed law, [citation]; knowingly operating a car with defective brakes [citation]; driving a vehicle when the windshield was so dirty as to cause poor visibility [citation]; and recklessly driving by zigzagging from side to side [citation]." (*People v. Capetillo*, *supra*, 220 Cal.App.3d at pp. 216–217; *People v. Weems*, *supra*, 54 Cal.App.4th at p. 861.)

In addition, "failure to ensure that one's passengers are wearing safety belts is a neglect of duty while driving, which can proximately cause bodily injury to someone other than the driver operating his vehicle while under the influence." (*People v. Weems*, *supra*, 54 Cal.App.4th at p. 861.)

In contrast, unlawfully driving a vehicle without the owner's permission, i.e., joyriding, does not satisfy the requisite element of doing an unlawful act in the driving of the vehicle within the meaning of section 23153. (*People v. Capetillo*, *supra*, 220 Cal.App.3d at p. 217; *People v. Weems*, *supra*, 54 Cal.App.4th at pp. 861–862.)

"The common thread weaving through all these cases is the violation of law or failure to perform a duty imposed by law occurred *when* the accused was driving the vehicle. Each case identifies some feature which is in addition to and independent from the mere act of driving the vehicle while under the influence of alcohol or a narcotic." (*People v. Capetillo*, *supra*, 220 Cal.App.3d at p. 217, italics in original; *People v. Weems*, *supra*, 54 Cal.App.4th at p. 861.)

## B. Instructions

As relevant to this issue, the jury was instructed as follows for the second element of both counts I and II:

> "The People allege that the defendant failed to perform the following legal duty while driving the vehicle: The duty to exercise ordinary care at all times to maintain proper control of the vehicle.
>
> "Using ordinary care means using reasonable care to prevent reasonably foreseeable harm to someone else. A person fails to exercise ordinary care if he or she does something that a reasonably careful person would not do in the same situation, or fails to do something that a reasonably careful person would do in the same situation."

## C. Analysis

There is overwhelming evidence that defendant failed to exercise ordinary care, in addition to driving under the influence, to support defendant's convictions for violating subdivisions (a) and (b) of section 23153. The reason why defendant drove his Jeep onto

13.

the Old Buchanan Mine Road is undisputed: he wanted to take Verville "four-wheel driving." Sandelin described the mine road as a gravel, rutted road that was unpaved and bumpy, with big rocks and boulders. Verville similarly testified it was an unpaved dirt road without any dividing lines, there were steeps hills, and portions were covered with brush.

Defendant decided to use this "road" to show Verville "how good [the Jeep] drives off road." There was no evidence the vehicle was suited for traversing the terrain or that defendant had training or experience for off road driving. Verville testified defendant performed a U-turn in an area that was covered with brush, and he drove into a bump, dip, or pothole that was not visible. Sandelin heard a "loud banging noise," almost like a "wrecking noise" from some type of a vehicle, as if "the vehicle's tire had dropped off of a big boulder." Sandelin testified there were a bunch of big rocks where the Jeep had stopped.

The jury in this case was correctly instructed that the second element of violating both provisions of section 23153 was satisfied by ordinary negligence. While the second element need not relate to any specific section of the Vehicle Code, we note that defendant's conduct amounted to a violation of section 21662, which states:

> "The driver of a motor vehicle traveling through defiles or canyons or upon mountain highways shall hold the motor vehicle under control at all times and shall do the following when applicable: [¶] (a) If the roadway has no marked centerline, the driver shall drive as near the right-hand edge of the roadway as is reasonably possible. [¶] (b) If the roadway has insufficient width to permit a motor vehicle to be driven entirely to the right of the center of the roadway, the driver shall give audible warning with the horn of the motor vehicle upon approaching any curve where the view is obstructed within a distance of 200 feet along the highway."

Section 21662 requires that "a driver maintain control of a vehicle on mountain highways 'at all times,' not just when the highway is curving or twisting or going up or down hill. In this way, the statute achieves its obvious purpose: to ensure safe vehicular

14.

traffic on mountain roads, canyons, and defiles." (*People v. Thompson* (2000) 79 Cal.App.4th 40, 63.)

Defendant's decision to go "four-wheeling" and "off-road driving" on a rutted, unpaved, and hilly road strewn with rocks and boulders and, more particularly, perform a U-turn in an area covered with brush, established his failure to exercise ordinary care and maintain proper control of the vehicle, entirely apart from driving under the influence.

## II. <u>Prosecutorial Misconduct</u>

As we explained in issue I, *ante*, the second element required for violating both provisions of section 23153 requires proof of "an unlawful act or neglect of duty *in addition* to driving under the influence. [Citation.]" (*People v. Minor*, *supra*, 28 Cal.App.4th at pp. 437–438, italics in original; *People v. Weems*, *supra*, 54 Cal.App.4th at p. 858; *People v. Givan*, *supra*, 233 Cal.App.4th at p. 349.)

Defendant contends the prosecutor committed prejudicial misconduct during closing argument by misstating the second element required to convict him of violating both subdivisions of section 23153, and equating driving under the influence as the requisite negligent act.

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to

15.

overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)

## A. Background

In closing argument, the prosecutor addressed the second element of counts I and II, as to defendant's failure to exercise ordinary care, and contrasted "on road" with "off road" driving.

> "…You need to be on your game, so to speak, when you are driving a car, to be safe for yourself, to be safe for your passengers, to be safe to the public. That is on-road driving.
>
> "What about off-road driving? That is a whole different ballgame. It is a different ball game. They even make vehicles differently to go off-roading. They are built tougher. They're built stronger. Things like seats being attached, very important in an off-road vehicle. They're designed to take a beating. If you have ever been inside a CJ7, that is a vehicle designed to take a beating. The roads are different when you go off-roading. There is [*sic*] all kinds of hazards that you don't have when you are driving down Washington Street. There are potholes, there are boulders. There is an off-road event called the Rubicon where they go out and they're literally crawling over boulders, and those people have to be on their game to do that. There is soft dirt when you go off-roading. There is [sic] traction issues. It requires extra caution when you go off-roading. It requires extra planning. You need to go slower when you are off-roading, unless you're maybe on the Bonneville Salt Flats or something like that because you need to see these obstacles coming. *You need to know where you're going when you are off-roading, and you need to know how to get yourself out of a problem when you get into it. Those are some of the things that you consider when you go off-road driving.*
>
> "When you go off-road driving, you must have your physical and mental abilities unimpaired. *When you go off-roading, you must drive with the caution of a sober person using ordinary care under similar circumstances. If not, someone could get hurt.*" (Italics added.)

The prosecutor continued:

> "What happens when you get behind the wheel of vehicle and you go off road, and because you're impaired by alcohol, you drive without the

16.

caution and characteristic of a sober person under similar circumstances?  A person could get hurt.  That is why you shouldn't do it.

"So it requires driving, these two offenses, it requires being under the influence or being a .08 or higher.  *It also requires that the person neglect a duty*.  Every person that gets behind the wheel of a car has a duty to perform a legal duty while driving.  When you put on that seat belt and you turn on that key, you've got that legal duty, and the duty here is to exercise ordinary care at all times.  It says 'all times.'  It doesn't say when you are on the pavement and then as soon as you see that dirt road you don't have to do it anymore.  At all times to prevent foreseeable harm to someone else.  And when you are driving on a rutted, potholed, boulder-strewn, bump-ridden – whatever word you want to use, you know that you could have foreseeable harm to someone if you don't take great care.  And by drinking – by drinking a lot, 10, 12, 16 – holy cow, a lot of beer, when you do that you get behind the wheel of a car, you are neglecting that duty.

"So, it also requires a failure to perform a duty causing bodily injury, so – it says in the law, 'An act causes bodily injury to another if the injury is a direct, natural, and probably consequence of the act.'  The act here is drinking a lot of beer, becoming impaired, and driving that car."  (Italics added.)

Defense counsel objected and said the prosecutor was misstating the law.  The court overruled the objection.  The prosecutor continued:

"You can look at the instruction.  What I say is not evidence, nor what [defense counsel] will say to you in a little bit is evidence.  It says 'An act causes bodily injury – ' and I just said it to you.

"*So what is that act?  The act is getting behind the wheel and driving that car.*"  (Italics added.)

Defense counsel again objected that the prosecutor was misstating the law.

In response to this objection, the court directed the attorneys to approach the bench, and the following sidebar conference took place.

"THE COURT:      The act is getting behind the wheel and driving a car without using ordinary care.  I think you left that part out.  [¶]  That is what your objection is?

"[DEFENSE COUNSEL]:  Well, it's using the word 'ordinary care.'  It is not just getting in the car.

17.

"THE COURT:     I agree.

"[THE PROSECUTOR]:    I'll clear it up.

"THE COURT:     Okay."

The prosecutor resumed his argument:

"So that act here is getting behind the wheel of a car and driving without using that ordinary care – that care, caution of a sober person under the same or similar circumstances.  So when you do that and it causes bodily injury, that bodily injury has to be a direct, natural, and probable consequence.

"So, using common sense, you get behind the wheel of a car and you are impaired, *and you are not driving with the caution characteristic of a sober person on a rutted road*, and injury to someone is clearly, clearly a direct, natural, and probable consequence.  That is why you never let a person get into a Jeep to go off-roading with an impaired driver.  Car pulls up, CJ7, CJ5, going to go off-roading, you look at the driver, he's got red watery eyes, he's got slurred speech, he got out of the car for a minute, he is showing unsteady gait, a person, I submit to you, would never get in that car because that person would be thinking to themselves this could happen.  Something bad could happen, someone could get injured.  That is what a direct, natural, and probable consequence is about.

"And [defendant] drank way too much that day and he got behind the wheel of the car and went off-roading because he wanted to go off-roading.  Mr. Verville wanted to go to the store.  He wanted to go off-roading.  And he did that without the caution characteristic of a sober person, and because of that, Mr. Verville got himself a trip to Sonora Regional in an ambulance to get 26 stitches in his head."  (Italics added.)

Defense counsel did not object.

In her closing argument, defense counsel stated that the elements of the charged offenses were "D.U.I. plus neglecting a duty," and "you have to keep them separate." Defense counsel argued Verville was injured only because the latch on the front seat became undone, and there was no evidence that defendant "had a duty about that seat latch."  Defense counsel argued that it should be expected that "when you go along the bumpy road, off-roading, that you may hit a pothole, you may go off the edge of a

18.

boulder, you may get knocked around in the car," but Verville's injury was only caused by "the seat unlatching," it was an unforeseen and unusual circumstance, and defendant did not neglect any duty that caused the injury.

## B. Analysis

Defendant asserts that while the prosecutor assured the court during the side-bar conference that he was going to "clear" up his argument, he again misstated the law after the side-bar because he "equated [defendant] having consumed alcohol and getting behind the wheel as a breach of that ordinary care." Defendant contends the prosecutor's argument was erroneous and left the jury "with the belief that they could find [defendant] guilty of counts one and two based on his having merely driven under the influence."

We first note that while defendant objected to several aspects of the prosecutor's closing argument, there was no objection to that portion of his argument which occurred after the side-bar conference. Nevertheless, defendant now asserts the prosecutor again misstated the law during his postconference argument.

" 'To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury.' [Citation.] There are two exceptions to this forfeiture: (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct. Forfeiture for failure to request an admonition will also not apply where the trial court immediately overruled the objection to the alleged misconduct, leaving defendant without an opportunity to request an admonition. A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

Defendant seeks to avoid forfeiture of his prosecutorial misconduct claim by arguing that any further objection or request for admonition after the side-bar conference

19.

would have been futile since the court overruled his first objection.  To the contrary, there is nothing in the record to indicate that another objection would have been futile.  While the court overruled defense counsel's initial objection, it responded to her second objection by conducting an extended side-bar conference, considering counsel's objection, and directing the prosecutor to clarify the applicable legal principles.  There is nothing in the record to indicate that another objection or a request for admonition would have been futile.  Defendant has thus forfeited review of this issue.

In any event, we find the entirety of the prosecutor's closing argument correctly stated the applicable law for counts I and II.  In claiming prosecutorial misconduct, "the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

As explained in issue I, *ante*, the jury was correctly instructed as to the second element of both counts, that "[a] person fails to exercise ordinary care if he or she does something that a reasonably careful person would not do in the same situation, or fails to do something that a reasonably careful person would do in the same situation."  As relevant to this element, the prosecutor contrasted on- and off-road driving, and explained that a "[y]ou need to know where you're going when you are off-roading, and you need to know how to get yourself out of a problem when you get into it.  Those are some of the things that you consider when you go off-road driving."  He further argued that "[e]very person that gets behind the wheel of a car has a duty to perform a legal duty while driving.  When you put on that seat belt and you turn on that key, you've got that legal duty, and the duty here is to exercise ordinary care at all times.  It says 'all times.'  It

20.

doesn't say when you are on the pavement and then as soon as you see that dirt road you don't have to do it anymore."

In the context of the whole argument and the instructions, we see no reasonable likelihood the jury construed the prosecutor's remarks as permitting conviction of both counts I and II by simply proving that defendant was driving under the influence. (See, e.g., *People v. Marshall*, *supra*, 13 Cal.4th at pp. 831–832.)

### DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, Acting P.J.

WE CONCUR:


_____
FRANSON, J.


_____
SMITH, J.

21.